FILED

08/23/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0695

DA 16-0695

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 210

THE COMMISSIONER OF POLITICAL
PRACTICES FOR THE STATE OF MONTANA,
through Jeff Mangan, acting in his
official capacity as The Commissioner
of Political Practices,

        Plaintiffs and Appellees,

   v.

ARTHUR "ART" WITTICH,

        Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis And Clark, Cause No. DV 2014-251
Honorable Ray Dayton, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Michael L. Rabb, The Rabb Law Firm, PLLC, Bozeman, Montana

        For Appellee:

        Gene R. Jarussi, Bishop & Heenan, Billings, Montana

        Jaime MacNaughton, Attorney at Law, Helena, Montana

        Submitted on Briefs:  July 12, 2017

        Decided:  August 23, 2017

Filed:

_____
               Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1   Montana's Commissioner of Political Practices, Jonathan Motl, initiated a judicial action against then-State Senator Art Wittich in April 2014, alleging that Wittich violated Montana campaign finance and practices laws during his 2010 primary campaign for Senate District 35. Following a five-day trial, a Lewis and Clark County jury concluded that Wittich accepted and failed to report nearly $20,000 in campaign contributions, including coordinated in-kind contributions, in violation of Montana campaign laws. The District Court denied Wittich's motion for a new trial and entered an order trebling the verdict amount. Wittich appeals.[1]

¶2   We consider the following issues on appeal:

*1.   Whether the Commissioner satisfied the statutory procedures for filing a judicial action against Wittich;*

*2.  Whether the District Court abused its discretion by denying Wittich's motions in limine to exclude two witnesses from testifying as experts;*

*3.  Whether the District Court abused its discretion in denying Wittich's motion for a new trial;*

*4.  Whether the District Court acted within its discretion in trebling the verdict amount.*

¶3   We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶4   In June 2010, Wittich won the Republican primary election for Senate District 35 in Gallatin County. Wittich went on to win the general election in November. In early 2010, Wittich—an attorney—represented Western Tradition Partnership in a case against

---

[1]  We have amended the caption to include the current Commissioner of Political Practices.

the Montana Attorney General and the Commissioner.  *W. Tradition P'ship v. Att'y Gen.*, 2011 MT 328, 363 Mont. 220, 271 P.3d 1.  Western Tradition Partnership acted as a "conduit of funds for persons and entities including corporations who want to spend money anonymously to influence Montana elections."  *W. Tradition P'ship*, ¶ 7.  The United States Supreme Court ultimately reversed this Court's holding in *Western Tradition Partnership* and concluded that Montana law violated the First Amendment by prohibiting political expenditures by corporations on behalf of candidates for public office.  *Am. Tradition P'ship, Inc. v. Bullock*, 567 U.S. 516, 132 S. Ct. 2490 (2012).  The High Court's decision did not address Montana's campaign finance disclosure and reporting requirements.

¶5     In September 2010, Debra Bonogofsky—a Republican candidate for House District 57 in Yellowstone County—filed an administrative complaint with the Commissioner against her primary opponent, Dan Kennedy.  Bonogofsky asserted that Kennedy violated Montana's campaign laws, in part, by coordinating with a number of groups on campaign mailings.  Her written complaint alleged:

> Only the candidates that are supported by these groups ([Western Tradition Partnership], Montana Conservative Alliance, Montana Citizens for Right to Work etc) are given the information to use Direct Mail and Communication, which is directly connected to [Western Tradition Partnership] through a common address in Aurora, CO.  The mailings that [Western Tradition Partnership] sent out and the mailings the candidates "sent out" are all too similar to be coincidence.  I maintain that Dan Kennedy and also the other candidates knew what kind of help they would receive and these mailings should not be considered an independent expenditure.

The Commissioner began investigating Bonogofsky's complaint.

¶6 During the investigation, Commissioner Motl identified a number of the "other candidates" Bonogofsky referenced in her complaint. One of the candidates was Wittich. The Commissioner consulted with Bonogofsky, and she directed that her complaint be filed against Wittich as well. Commissioner Motl notified Wittich of the complaint in January 2014 and issued a Sufficiency Decision on March 31, 2014. The Commissioner concluded that Wittich violated Montana's campaign laws during his 2010 primary by failing to report or disclose expenses for services associated with campaign mailings that the Commissioner determined were in-kind contributions, by accepting illegal corporate contributions through coordination, and by failing to maintain or produce campaign finance records. The Commissioner concluded further that the case warranted civil adjudication.

¶7 Commissioner Motl notified the Lewis and Clark County Attorney of the Sufficiency Decision the same day it was issued. The County Attorney waived his right to prosecute the alleged violations. The next day, the Commissioner filed the underlying complaint against Wittich in the First Judicial District Court, Lewis and Clark County.

¶8 Wittich moved to dismiss, arguing that the District Court lacked subject matter jurisdiction because the Commissioner referred the matter to the wrong county attorney before filing the judicial action in violation of § 13-37-124, MCA. The District Court denied the motion following a hearing. Wittich filed another motion to dismiss for lack of subject matter jurisdiction because an administrative complaint was not filed against him with the Commissioner. The District Court denied the motion, and Wittich appealed. This Court dismissed Wittich's appeal as premature, based in part on our conclusion that

4

"the issues on appeal are not matters implicating the court's subject matter jurisdiction." *Comm'r of Political Practices v. Wittich*, No. DA 16-0151, Or. (Mont. Mar. 18, 2016).

¶9 Wittich moved to amend his answer to add an affirmative defense. His affirmative defense asserted that the laws underlying the Commissioner's complaint violated his right to freedom of speech under the United States and Montana Constitutions. In its order allowing the amendment, the District Court noted that it was a "claim that could be handled by briefing prior to the trial." Wittich did not brief the issue or request a legal ruling prior to trial. The final pretrial order included Wittich's affirmative defense, and the parties discussed the issue during the final pretrial conference. The District Court concluded during the conference that Wittich could not raise the issue during trial because it was "not a jury question." The court reiterated during settlement of jury instructions that Wittich's affirmative defense did not "raise the type of claims that are appropriate for submission to the jury." The District Court ultimately rejected Wittich's proposed jury instruction on his affirmative defense and instructed the jury on a definition of "contribution" that Wittich asserted was unconstitutional. Wittich did not object to the rejection of his jury instruction or to the given instruction defining "contribution."[2]

¶10 Commissioner Motl disclosed two experts prior to trial—himself and C.B. Pearson, a campaign consultant. Wittich filed motions in limine to exclude both

---

[2] The District Court and the parties agreed to settle the jury instructions off the record. The court allowed the parties to offer objections to any proposed instructions on the record outside the presence of the jury. Wittich has not included his rejected proposed jury instruction in the record on appeal.

5

Commissioner Motl and Pearson from testifying as experts. The District Court denied both motions and allowed the Commissioner and Pearson to testify as experts during the trial.

¶11 The jury trial began on March 28, 2016. By then, Wittich had been elected to the Montana House of Representatives. After the parties' opening statements, a juror approached the Clerk of Court and expressed concern that she may not be able to remain unbiased because she felt that Wittich was being unfairly prosecuted. The Clerk reported the issue to the court and the court conferred together with the parties' counsel and the juror. Upon questioning by the court, the juror stated that she thought she could reserve her judgment until the parties had presented all of the evidence, but she stated also that she "felt all along [that she] shouldn't be part of this." Following their discussion, the District Court excused the juror. It expressed concern to counsel that the juror was "distraught" and that she was "on the edge of a breakdown." After discussing the matter further with counsel, the court released the juror.

¶12 The trial proceeded for five days. The jury concluded that Wittich failed to maintain and preserve records of his campaign contributions and expenditures; that he accepted or received corporate contributions, including coordinated in-kind contributions; and that he failed to report all contributions, including coordinated in-kind contributions. The jury determined that Wittich accepted and failed to report $19,599 in corporate contributions, including coordinated in-kind contributions. The District Court trebled the verdict amount and entered judgment in the amount of $68,232.58. The final judgment

6

included $9,435.58 in penalties for violations the court had determined in a prior summary judgment order.

¶13 Wittich filed a motion for a new trial, which the District Court denied. Wittich appeals.

## STANDARDS OF REVIEW

¶14 We review a district court's interpretation of a statute for correctness. *Williams v. Bd. of Cnty. Comm'rs*, 2013 MT 243, ¶ 24, 371 Mont. 356, 308 P.3d 88. We review a district court's discretionary rulings for an abuse of discretion. *Plath v. Schonrock*, 2003 MT 21, ¶ 13, 314 Mont. 101, 64 P.3d 984. Similarly, we review a district court's ruling on the admissibility of expert testimony for an abuse of discretion. *Cartwright v. Scheels All Sports, Inc.*, 2013 MT 158, ¶ 37, 370 Mont. 369, 310 P.3d 1080. The decision to grant or deny a new trial is within the sound discretion of the trial judge and will not be disturbed absent a showing of manifest abuse of that discretion. *Willing v. Quebedeaux*, 2009 MT 102, ¶ 19, 350 Mont. 119, 204 P.3d 1248. A district court abuses its discretion if it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *Plath*, ¶ 13.

## DISCUSSION

¶15 *1. Whether the Commissioner satisfied the statutory procedures for filing a judicial action against Wittich.*

¶16 Wittich asserts two grounds in arguing that the District Court did not have jurisdiction because the Commissioner failed to satisfy certain "statutorily mandated prerequisites" for filing the judicial action against him: (1) a complaint was not

7

submitted to the Commissioner against Wittich, and alternatively the Commissioner did not issue Wittich a notice and order of noncompliance; and (2) the Commissioner failed to refer the matter to the appropriate county attorney before filing suit.

**A. Whether Bonogofsky's complaint was sufficient to initiate the Commissioner's investigation of Wittich and whether the Commissioner was required to issue Wittich a notice and order of noncompliance prior to bringing the judicial action.**

¶17 Wittich asserts that the Commissioner did not satisfy certain "statutory prerequisites" before initiating the action against him because Bonogofsky's complaint did not explicitly name him and because the Commissioner did not issue him a notice and order of noncompliance. Relying on § 13-37-111(2), MCA, and Admin. R. M. 44.10.307(2) (2010), Wittich contends that a "proper written complaint" must be filed against a candidate before the Commissioner "may investigate violations that are unrelated to statements filed with the [Commissioner]." Wittich contends further that "Montana law explicitly requires a written administrative complaint naming the alleged violator" and that the Commissioner therefore improperly sought to "expand" Bonogofsky's complaint to include him. Because Bonogofsky's complaint did not explicitly name him, Wittich argues that "[n]o administrative complaint was ever made against" him. As such, Wittich alleges that the Commissioner did not have the statutory authority to investigate him or subsequently to file the judicial action against him.

¶18 Wittich asserts that if there was no complaint naming him specifically, the Commissioner had to issue him a notice and order of noncompliance. Relying on § 13-37-121(5), MCA, Wittich contends that such a notice is a "prerequisite to initiation of any administrative or judicial action." Because the Commissioner did not follow

8

either of these "statutorily mandated prerequisites," Wittich argues that the action was not properly before the District Court.

¶19 Title 13, chapter 37, MCA, governs the claims against Wittich. In interpreting the statutes contained in that chapter, our role "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We construe statutes "according to the plain meaning" of their language. *Fellows v. Saylor*, 2016 MT 45, ¶ 21, 382 Mont. 298, 367 P.3d 732.

¶20 Montana law makes the Commissioner "responsible for investigating all of the alleged violations of the election laws contained in chapter 35 of [Title 13] or this chapter and in conjunction with the county attorneys [the Commissioner] is responsible for enforcing these election laws." Section 13-37-111(1), MCA. Section 13-37-111(2)(a), MCA, provides that "[u]pon the submission of a written complaint by any individual, the commissioner shall investigate any other alleged violation of the provisions of . . . this chapter." The procedures prescribed in § 13-37-121, MCA, regarding notice and orders of noncompliance pertain to the Commissioner's inspection of a candidate's campaign statements and reports. *See*, *e.g.*, § 13-37-121(1), MCA (providing that the Commissioner must inspect each statement and report filed with the Commissioner, and if the statement or report does not satisfy chapter 37's provisions, the Commissioner "shall immediately notify the person of the noncompliance" and issue "an order of noncompliance as provided in this section" if the person fails to comply). If an individual files a complaint with the Commissioner "pursuant to 13-37-111, the procedure described

9

in this section regarding the provision of notice and issuance of orders of noncompliance is not a prerequisite to initiation of any other administrative or judicial action." Section 13-37-121(5), MCA.

¶21 It is undisputed that Bonogofsky properly submitted a written complaint with the Commissioner and that the complaint specifically named Kennedy as the person against whom the complaint was brought. The complaint alleged that Kennedy violated Montana's campaign laws through his "association and endorsement by Western Tradition Partnership and Dan Fuchs and Direct Mail and Communication." Bonogofsky alleged further that "[t]hese groups while not registered with the State of Montana are really political committees and should operate under the laws regulating these committees. Therefore under Montana Law, they are subsequently [sic] subject to the limitations on contributions." Her complaint went on to allege that "[o]nly the *candidates* that are supported by these groups . . . are given the information to use Direct Mail and Communication . . . . The mailings that [Western Tradition Partnership] sent out and the mailings the *candidates* 'sent out' are all too similar to be coincidence." (Emphasis added). Bonogofsky continued, "I maintain that Dan Kennedy and also the *other candidates* knew what kind of help they would receive and these mailings should not be considered an independent expenditure." (Emphasis added).

¶22 Bonogofsky's complaint did not allege that only Kennedy violated Montana's campaign laws; rather, the complaint alleged that "other candidates" violated Montana's campaign laws as well. The Commissioner was "responsible for investigating *all* of the alleged violations of the election laws" brought forth in Bonogofsky's complaint.

10

Section 13-37-111(1), MCA (emphasis added). In fact, after Bonogofsky submitted her written complaint with the Commissioner, the plain language of § 13-37-111, MCA, explicitly required the Commissioner to "*investigate any other alleged violation*" of Montana's campaign laws included in the complaint. Section 13-37-111(2)(a), MCA (emphasis added). This encompassed Bonogofsky's allegations pertaining to the "other candidates."

¶23 During his investigation of the alleged violations in Bonogofsky's complaint, the Commissioner identified Wittich as one of the "other candidates" whom Bonogofsky alleged had violated Montana's campaign laws. At that point, the Commissioner consulted Bonogofsky, and she directed that her complaint be filed against Wittich. Section 13-37-111, MCA, authorized the Commissioner to investigate Wittich based upon Bonogofsky's complaint. Further, because Bonogofsky filed her complaint pursuant to § 13-37-111, MCA, issuing notice and an order of noncompliance was "*not a prerequisite to initiation of any . . . judicial action.*" Section 13-37-121(5), MCA (emphasis added). Such notice and order of noncompliance would have been required if the Commissioner initiated a civil action against Wittich based on the Commissioner's inspection of Wittich's campaign statements and reports, and not on Bonogofsky's complaint. Section 13-37-121, MCA.

¶24 Wittich's reliance on §§ 13-37-111(2) and -121(5), MCA, to assert that the Commissioner did not have the authority to investigate him or to initiate the judicial action against him is misplaced. His interpretation of the statutes runs counter to their plain language. Moreover, Wittich's interpretation of § 13-37-111(2), MCA, inserts a

11

requirement into the statute that the Legislature omitted. Nothing in the statute "explicitly requires a written administrative complaint naming the alleged violator." Instead, the statute requires "the submission of a written complaint" and that the Commissioner "investigate any other alleged violation" contained in the complaint. Section 13-37-111(2)(a), MCA.

¶25 Wittich's reliance on Admin. R. M. 44.10.307(2) (2010) to assert that the District Court lacked jurisdiction to hear the case is similarly misplaced. It is well established that administrative rules do not affect a court's jurisdiction to hear a case. "[J]urisdiction is conferred on courts only by the Constitution or statutes adopted pursuant to the Constitution." *Pinnow v. Mont. State Fund*, 2007 MT 332, ¶ 20, 340 Mont. 217, 172 P.3d 1237 (citing *Stanley v. Lemire*, 2006 MT 304, ¶ 52, 334 Mont. 489, 148 P.3d 643); *accord State v. Burch*, 2008 MT 118, ¶ 29, 342 Mont. 499, 182 P.3d 66 ("[W]e have repeatedly held that a district court's authority is determined by statute, not administrative rule."). Further, the statutes—and not the administrative rules—vest the Commissioner with authority to investigate and enforce alleged violations of Montana's campaign laws. Wittich's arguments that the District Court lacked authority to hear the case because the Commissioner failed to follow "statutorily mandated prerequisites" recognize as much.

¶26 We conclude that Bonogofsky's complaint was sufficient to initiate both the Commissioner's investigation into Wittich and the resulting judicial action against Wittich. We conclude further that the Commissioner was not required to issue Wittich a notice and order of noncompliance.

**B. Whether the Commissioner failed to refer the matter to the appropriate county attorney before filing the judicial action against Wittich.**

¶27 Relying on § 13-37-124, MCA, Wittich asserts that the Commissioner failed to "first notify and arrange to transmit relevant information to the county attorney where the alleged violation occurred" before filing a judicial action. Wittich contends that the alleged violation occurred entirely in Gallatin County because all of his "campaign activities" took place there, "including all accounting, bookkeeping, receipt of contributions, and administrative tasks related to his campaign." Moreover, Wittich argues, the Commissioner may initiate a judicial action only once the county attorney where the alleged violation occurred has waived its right to prosecute. Because the Commissioner did not notify or arrange to transmit the relevant information to the Gallatin County Attorney, and the Gallatin County Attorney was not afforded an opportunity to waive its right to bring the action, Wittich alleges that the Commissioner failed to follow another "statutorily mandated prerequisite" to bringing the action against him. As such, Wittich contends that the District Court did not have subject matter jurisdiction over the action.

¶28 Contrary to Wittich's assertions, whether the Commissioner failed to refer the matter to the appropriate county attorney under § 13-37-124, MCA, is an issue "of statutory interpretation and not one of subject matter jurisdiction." *Comm'r of Political Practices for Mont. v. Bannan*, 2015 MT 220, ¶ 11, 380 Mont. 194, 354 P.3d 601. We dismissed Wittich's earlier appeal in this case on the same ground. *Comm'r of Political*

*Practices v. Wittich*, No. DA 16-0151, Or. (Mont., Mar. 18, 2016). We decline to address the jurisdictional argument further and turn instead to the relevant statutory interpretation.

¶29 After the Commissioner renders a sufficiency decision, "the commissioner shall notify the county attorney of the county in which the alleged violation occurred and shall arrange to transmit to the county attorney all information relevant to the alleged violation." Section 13-37-124(1), MCA. If the county attorney does not initiate an action within thirty days of receiving notice of the violation, or waives its right to prosecute, the Commissioner may "initiate the appropriate" action. Section 13-37-124(1)-(2), MCA. Subject to the provisions of § 13-37-124, MCA, "[a]ll prosecutions [of violations of Montana campaign laws] must be brought in the state district court for the county in which a violation has occurred or in the district court for Lewis and Clark County." Section 13-37-113, MCA.

¶30 The plain language of § 13-37-124(1), MCA, does not require that the Commissioner refer the matter to the county attorney where the "campaign activities" occurred; rather, it requires that the Commissioner refer the matter to the county attorney where "the alleged violation occurred." In contrast, § 13-37-122, MCA, provides that "[a] candidate . . . who is the subject of an order of noncompliance may seek judicial review in the district court of the county in which the candidate resides." These venue provisions are distinct from one another.

¶31 As the District Court concluded in denying Wittich's motion to dismiss, "there are certain portions of the complaint that allege violations which occurred in Gallatin County. However, the complaint also alleges violations occurring in Lewis and Clark

14

County." Those alleged violations included Wittich's failure to file or report certain campaign documents with the Commissioner in Lewis and Clark County. The statute contemplates actions in the First Judicial District, § 13-37-113, MCA, and the District Court did not err as a matter of law in concluding that at least some of the alleged violations occurred in Lewis and Clark County. As such, the Commissioner referred the matter to an appropriate county attorney pursuant to § 13-37-124(1), MCA, and the Commissioner properly initiated the judicial action once the Lewis and Clark County Attorney waived its right to prosecute pursuant to § 13-37-124(2), MCA.

¶32 We conclude that the Commissioner satisfied the statutory procedures for filing the judicial action against Wittich.

¶33 *2. Whether the District Court abused its discretion by denying Wittich's motions in limine to exclude two witnesses from testifying as experts.*

¶34 Wittich asserts that the District Court erred by allowing Commissioner Motl and Pearson to testify as expert witnesses. He argues that the Commissioner's opinions were improper legal conclusions and that Pearson was not qualified as an expert.

**A. Whether admission of the Commissioner's expert opinions constituted reversible error.**

¶35 In denying Wittich's motion to exclude Commissioner Motl as an expert witness, the District Court analyzed the relevant factors for determining the reliability of expert testimony under M. R. Evid. 702. The court determined first that "the complicated and nuanced world of campaign finance is sufficiently specialized that expert testimony will help the trier of fact to understand the evidence." In concluding that Commissioner Motl was qualified to give opinions on campaign finance, the District Court noted that the

15

Commissioner "may be *the* expert on campaign finance issues in Montana." (Emphasis in original). Finally, the court determined that Commissioner Motl would be "an appropriate fact witness" because the Commissioner had "conducted research and interviewed witnesses" and would therefore have "relevant evidence to provide the jury with [sic] on whether Wittich violated Montana's campaign finance laws."

¶36 On appeal, Wittich does not challenge the District Court's determination that the Commissioner was qualified as an expert under M. R. Evid. 702. Rather, Wittich contends that the District Court improperly permitted the Commissioner to testify as an expert because "the opinions offered by the [Commissioner] were legal conclusions and were applying law to fact." The Commissioner's testimony, in Wittich's view, was therefore contrary to M. R. Evid. 704. Wittich alleges that Commissioner Motl "improperly invad[ed] the province of the judge and jury" because he expressed legal conclusions and applied the law to facts. The Commissioner does not respond to Wittich's argument on the merits, but asserts that he waived it by failing to object at trial.

¶37 Wittich preserved his objection to Commissioner Motl's testimony. Wittich's motion in limine to exclude Commissioner Motl from testifying asserted the same grounds that he argues on appeal. Although the District Court's order denying Wittich's motion did not address the argument specifically, the court did note that the Commissioner represented in his briefing that "Motl will not offer any evidence about the ultimate issues of law." "[W]e have repeatedly held that a party need not make a contemporaneous objection if the objection would be redundant of a motion in limine." *Anderson v. BNSF Ry.*, 2015 MT 240, ¶ 77, 380 Mont. 319, 354 P.3d 1248. During

16

Commissioner Motl's direct examination, Wittich also made a contemporaneous objection "to the legal opinion being expressed" and asked to approach the judge. A sidebar conference was held off the record, so we do not have the benefit of reviewing what was discussed. Nevertheless, Wittich preserved his objection to Commissioner Motl's testimony and we will address the merits of his arguments.

¶38 District courts "are vested with great latitude in ruling on the admissibility of expert testimony." *Cartwright*, ¶ 37. The rules of evidence allow an expert to "testify in terms of opinion or inference." M. R. Evid. 705. The rules allow those opinions and inferences to "embrace[ ] an ultimate issue to be decided by the trier of fact." M. R. Evid. 704; *accord Perdue v. Gagnon Farms, Inc.*, 2003 MT 47, ¶ 28, 314 Mont. 303, 65 P.3d 570. Thus, "an expert witness may properly testify as to an ultimate issue of fact." *Perdue*, ¶ 28. But an expert may not offer testimony "that states a legal conclusion or applies the law to the facts." *Perdue*, ¶ 28. This Court distinguishes "ultimate issues of fact from ultimate issues of law because legal conclusions offered by an expert witness invade the province of the jury." *Perdue*, ¶ 28; *accord Hart-Anderson v. Hauck*, 230 Mont. 63, 72, 748 P.2d 937, 942 (1988) ("It is for the jury to evaluate the facts in the light of the applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum." (Citation and internal quotations omitted)); *Wicklund v. Sundheim*, 2016 MT 62, ¶ 15, 383 Mont. 1, 367 P.3d 403 ("Legal conclusions offered by an expert witness invade the province of the fact-finder, whose duty it is to apply the law as given to the facts in the case.").

¶39 Although the distinction between an ultimate issue of fact and a legal conclusion in some cases may be subtle, the distinction is significant. For example, "the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." *Heltborg v. Modern Mach.*, 244 Mont. 24, 29, 795 P.2d 954, 957 (1990) (citation and internal quotations omitted). An expert's testimony as to the first question "amounts to no more than an expression of the [witness's] general belief as to how the case should be decided," *Heltborg*, 244 Mont. at 31, 795 P.2d at 958 (citation and internal quotations omitted), while an expert's testimony as to the second question "embraces an ultimate issue to be decided by the trier of fact," M. R. Evid. 704.

¶40 A review of our case law further elucidates this distinction. We have held the following expert testimony to be inadmissible legal conclusions: whether a defendant had breached the covenant of good faith and fair dealing, *Heltborg*, 244 Mont. at 32, 795 P.2d at 958; whether an insurer breached its statutory obligations under Montana's Unfair Claims Settlement Practices Act, *Hart-Anderson*, 230 Mont. at 72, 748 P.2d at 942; and whether a county commission's growth policy revisions met the legal requirements of Montana statute, *Citizens for a Better Flathead v. Bd. of Cnty. Comm'rs*, 2016 MT 256, ¶ 18, 385 Mont. 156, 381 P.3d 555. In each of these cases, by applying the law to the facts of the case, the experts' testimony did more than "assist the trier of fact to understand the evidence or to determine a fact in issue." M. R. Evid. 702.

18

¶41 On the other hand, we have concluded that the following expert testimony was permissible: an officer's opinions regarding the cause of an accident, *Perdue*, ¶ 31; assessment of an employer's "actions in the context of accepted human resources practices" that "did not track the legal elements of wrongful discharge," *Cartwright*, ¶ 44; and testimony on a train crew's obligations and duties while approaching a railroad crossing, *Mickelson v. Mont. Rail Link*, 2000 MT 111, ¶ 103, 299 Mont. 348, 999 P.2d 985. Our case law demonstrates that even though testimony on an ultimate issue of fact may implicate legal issues, an expert's testimony is admissible as long as it does not reach a legal conclusion or apply the law to the facts. *Perdue*, ¶ 31 (concluding that although "counsel's questioning of [the investigating officer] intimates legal issues, such as whether [the driver being sued for negligence] acted negligently by driving on a defective tire or at half the posted speed limit, [the investigating officer's] testimony reached no legal conclusions on these matters"). It is the jury's duty "to apply the law as given in the jury instructions to the facts of the case." *Perdue*, ¶ 28.

¶42 Here, the District Court instructed the jury that it "should take the law in this case from my instructions alone." The court then instructed the jury on Montana's campaign finance and practices laws regarding the definitions of relevant terms and the requirements for reporting campaign contributions and expenditures, coordination with outside entities, and contributions from corporations. The instructions directed the jury to determine the following issues:

> Did [Wittich] fail to maintain and preserve records of his campaign contributions and expenditures in his 2010 primary election, in violation of Montana campaign practices laws?

19

> Did [Wittich] accept or receive corporate contributions, including coordinated in-kind contributions, in his 2010 primary election, in violation of Montana campaign practice laws?
>
> Did [Wittich] fail to report all contributions, including coordinated in-kind contributions, in his 2010 primary election, in violation of Montana campaign practice laws?

The ultimate issues of fact to be decided by the jury were: whether Wittich failed to maintain and preserve campaign finance records; whether he accepted or received corporate contributions, including coordinated in-kind contributions; and whether he failed to report those contributions. The ultimate issue of law that the jury had to apply to the facts was whether Wittich did those things "in violation of Montana campaign practice laws." Although the ultimate issues of fact the jury had to decide certainly implicated whether Wittich violated Montana campaign practices laws, the rules of evidence permitted the Commissioner to testify as to his opinions on those issues so long as he did not offer legal conclusions. *See Perdue*, ¶ 31. This is because it was the jury's duty to apply Montana's campaign laws as given in the District Court's jury instructions to the ultimate issues of fact in the case. *See Perdue*, ¶ 28.

¶43 Issues of fact and law do not neatly divide in a case brought to assess compliance with campaign finance laws. Wittich takes issue with Commissioner Motl's responses to the following questions: whether Wittich "produced documents, records, and accounts . . . that Montana campaign practice standards expects [sic] him to keep and produce"; whether the Commissioner had "developed an opinion on the fact of coordination"; and whether "there was a failure to report and disclose in this matter."

Our review of the record establishes that, to some extent, Commissioner Motl's often narrative answers embraced the overlapping ultimate issues of fact and issues of law, notwithstanding his phrasing of his opinions as on "matters of fact." For example, when asked for his "opinion on the fact of coordination," Commissioner Motl responded, "My opinion is that Mr. Wittich coordinated with the umbrella group of National Right to Work corporations." The court's instructions to the jury specified that "[u]nder Montana law, a 'coordinated expenditure' means an expenditure . . . that is made in cooperation with, consultation with, at the request or suggestion of, or with the prior consent of a candidate."

¶44 At the same time, the jury instructions provided that "[t]o find an expenditure is coordinated, there must be actual, objective evidence showing coordination between the expenditure and the candidate." After being asked his opinion as to coordination, Commissioner Motl was asked what he based that opinion on. He responded:

> Well, the basis of the opinion, looking first to the specific facts, the exhibits before the jury contain 15 emails by Art Wittich to Christian LeFer, Alli LeFer, Andrew O'Neill, Jedd Coburn, and Sarah Anderson. Those emails, those 15 emails, deal with general campaign work, candidate profile at the very start of the campaign. They develop with—they deal with the walking list work. They deal with copy drafting letters, website work, and graphics. Those people are all paid staff of the umbrella group of corporations that are working under National Right to Work.
>
> In addition to those 15 email contacts, there was 15 phone calls, at least 15 phone calls, from Mr. Wittich's phone numbers to Mr. LeFer's phone numbers. I think that is significant because of the extent to which the activity of the National Right to Work group of corporations was attempted to keep secret. But we have 15 phone calls there alone.
>
> Then there is the idea that a candidate would allow robo call—would allow robo placed signatures on letters. That is the most significant campaign

21

activity of this campaign, 11,000 Direct Mail letters mailed into his district in the closing weeks of his campaign. His . . . robo placed signature was placed on every one of them. That shows a great deal of trust and cooperation between the candidate and those umbrella group of corporations.

Commissioner Motl went on to testify that he investigated the timing of the contacts between Wittich and the entities at issue and that those entities did not report or disclose any independent expenditures to his office in the 2010 Senate District 35 campaign. Commissioner Motl's testimony was dominated by hard factual evidence of coordination between Wittich and the entities at issue.

¶45 An erroneous evidentiary ruling does not constitute reversible error "unless a substantial right of the party is affected." M. R. Evid. 103. A party's substantial right "is not affected unless the challenged evidence is of such character to have affected the result of the case." *In re Estate of Edwards*, 2017 MT 93, ¶ 50, 387 Mont. 274, 393 P.3d 639 (citation and internal quotations omitted). Although Commissioner Motl offered some legal conclusions, the majority of his testimony assisted the jury in "determin[ing] a fact in issue," M. R. Evid. 702, by providing "actual, objective evidence showing coordination between" the entities and Wittich. To the extent that Commissioner Motl's testimony conveyed to the jury that Wittich violated Montana campaign laws, any error did not prejudice the outcome or otherwise undermine the propriety of the proceeding. He offered proper factual information to show that Wittich had violated the law, as well as proper expert testimony to inform the jury about the campaign finance process.

¶46 Moreover, on cross-examination, Wittich's "counsel had adequate opportunity to bring forth the weaknesses of any assumptions or facts underlying [the Commissioner's]

22

opinion." *Perdue*, ¶ 31. Wittich's counsel questioned the Commissioner regarding an "alternative explanation" for the alleged coordination between Wittich and Western Tradition Partnership and questioned Commissioner Motl's potential biases stemming from Wittich's representation of Western Tradition Partnership in the case against the Commissioner. The Commissioner "offered his factual considerations for the jury's consideration, which did not invade the province of the trier of fact. The jury remained free to decide the weight to give [the Commissioner's] opinion." *Perdue*, ¶ 31.

¶47 Viewing the Commissioner's testimony in its entirety, we conclude that the District Court did not act arbitrarily, without employment of conscientious judgment, or exceed the bounds of reason resulting in substantial injustice" in permitting the Commissioner's testimony. Accordingly, we hold that the District Court did not abuse its discretion by admitting Commissioner Motl's expert testimony.

**B. Whether Pearson was qualified to testify as an expert.**

¶48 In denying Wittich's motion to exclude Pearson as an expert witness, the District Court again analyzed the relevant reliability factors under M. R. Evid. 702. In determining whether Pearson was qualified to give opinions "regarding the costs associated with running a campaign," the court noted that Pearson had "over 30 years' experience in Montana political campaigns." The court concluded that "Pearson's experience is sufficient to allow him to give opinions on the subject." Relying on *State v. Ayers*, 2003 MT 114, ¶ 48, 315 Mont. 395, 68 P.3d 768, the court determined that Wittich's attacks on the viability of Pearson's methodology for calculating campaign costs went to the weight of Pearson's testimony and not to its admissibility. The court

23

concluded, "If Wittich has concerns about [Pearson's] qualifications or his methodology, he should raise those issues on cross examination."

¶49 Wittich contends that Pearson was not an expert in the field because "he was not qualified to testify about the costs that a print shop would have incurred back in 2010 to produce" the mailings at issue. Pearson was not qualified to express such opinions, Wittich asserts, because Pearson did not have "any education or experience in third-party print-shops or the printing industry." Wittich emphasizes that Pearson "had never worked on a candidate's campaign, and had never sent the type of letters and slicks out that were in issue in this case." Moreover, Wittich alleges, Pearson's testimony was "the only testimony provided to the jury about the value of alleged in-kind corporate contributions pertaining to the [mailings at issue] and accounted for over two-thirds of the final verdict amount." As such, Wittich contends that the District Court's denial of his motion in limine to exclude "Pearson's opinions was an abuse of discretion that constituted reversible error when those opinions were expressed during trial to quantify the amount of in-kind contributions that Mr. Wittich allegedly received for printing and mailing" the campaign mailings at issue.

¶50 Under M. R. Evid. 702, a witness may be "qualified as an expert by knowledge, skill, experience, training or education." Montana's "standard for expert testimony contemplates that an expert's field will encompass the particular area about which he or she will testify; but the field is not coextensive with its application to the particular facts of the case." *McClue v. Safeco Ins. Co.*, 2015 MT 222, ¶ 25, 380 Mont. 204, 354 P.3d

604. "A 'field' of expertise is an area, category, or division wherein a particular activity or pursuit is carried out." *McClue*, ¶ 25 (citation and internal quotations omitted).

¶51 Whether a "witness is an expert is a question of admissibility within the discretion of the trial court, but the degree of the expert's qualifications goes to the weight of the evidence and is a question for the jury." *Wacker v. Park Rural Elec. Coop.*, 239 Mont. 500, 501-02, 783 P.2d 360, 361 (1989). Our expert testimony standard "recognizes that admissible expert evidence should come in, even if that evidence may be characterized as 'shaky.'" *McClue*, ¶ 23. The expert's qualifications and testimony then are "open for attack through the traditional and appropriate methods: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *McClue*, ¶ 23 (citation and internal quotations omitted).

¶52 Wittich characterizes the relevant field of expertise as third-party print shops that print the types of mailings at issue in this case. As the District Court noted, however, the issue requiring an expert was "the costs associated with running a campaign." Running a campaign was the relevant field of expertise because it was the area in which the particular activity—the costs associated with the printing of "attack letters," "attack slicks," and "survey letters"—was carried out. *See McClue*, ¶ 25. In other words, "running a campaign" encompasses campaign mailings produced by third-party print shops. Contrary to Wittich's assertions, the expert's field—running a campaign—did not have to be "coextensive with its application to the particular facts of the case." *McClue*, ¶ 25.

¶53 Pearson's CV indicated that he had a "[f]orty-year public interest career" and that he had been a part of "numerous policy and public policy election campaigns in Montana and the West." His CV identified four cases in which he had been recognized as an expert and listed fifteen Montana mill levy, initiative, and referendum campaigns with which he had been involved since 1988. His CV stated also that he had written five campaign finance research reports and that he had legislative experience dating back to 1989. Wittich has failed to demonstrate that the District Court acted arbitrarily in determining that "Pearson's experience is sufficient to allow him to give opinions on the subject" of running a campaign.

¶54 Wittich's arguments pertaining to Pearson's lack of education and experience in the printing industry go to the degree of Pearson's qualifications, not whether he was qualified as an expert in running a campaign. *See Wacker*, 239 Mont. at 501-02, 783 P.2d at 361. The fact that Pearson had not worked on a candidate's campaign or sent similar mailings to the ones at issue was open for attack through vigorous cross-examination. *See McClue*, ¶ 23. Wittich's counsel made the seemingly strategic decision not to question Pearson on cross-examination about his lack of experience on a candidate's campaign, in third-party print shops, or in the printing industry. Instead, he questioned Pearson about his potential biases against Western Tradition Partnership, another area proper for cross-examination.

¶55 Wittich's counsel's decision not to question Pearson regarding his methodology for calculating the costs associated with printing the mailings at issue was seemingly strategic as well. The District Court concluded correctly that Wittich's arguments

26

regarding "the viability of Pearson's methodology goes to its weight, not its admissibility." *See Ayers*, ¶ 48 (concluding that "criticisms of specific applications of procedures or concerns about the accuracy of test results does not render the scientific theory and methodology invalid or destroy their general acceptance. These questions go to the weight of the evidence, not the admissibility." (Citations and internal quotations omitted)). As Wittich acknowledges on appeal, Pearson's testimony "was the only testimony provided to the jury about the value of alleged in-kind corporate contributions pertaining to the" mailings at issue. We will not fault the District Court for Wittich's decision not to present contrary evidence or to question Pearson on cross-examination regarding how he calculated that amount.

¶56 Wittich has not met his burden on appeal to demonstrate that the District Court abused its discretion in determining that Pearson was qualified to testify as an expert. Accordingly, we affirm the District Court's denial of Wittich's motion to exclude Pearson as an expert witness.

¶57 *3. Whether the District Court abused its discretion in denying Wittich's motion for a new trial.*

¶58 Wittich asserts that the District Court should have granted his motion for a new trial because the court improperly dismissed a juror after opening statements and because it improperly prohibited Wittich from asserting his affirmative defense on the unconstitutional application of Montana's campaign finance laws. He does not argue—as he did to the District Court—that a new trial was warranted because Pearson's estimate of

27

the mailings' value provided insufficient evidence to justify the jury's verdict. We address the arguments Wittich has made on appeal.

**A. Dismissal of the juror after opening statements.**

¶59 The District Court discussed with both parties' counsel whether to dismiss the juror who expressed concern about her ability to remain unbiased. During that discussion, the court asked Wittich's counsel: "Well, do you think you have a right to her . . . ?" Wittich's counsel responded: "I don't think she's disqualified herself for cause, and we're not—I mean, she said that she's prepared to go forward. And we're—we—until she says something that would disqualify her for cause, I guess we could—." The discussion continued regarding what to do with the juror. Wittich's counsel did not say anything else until after the court decided to dismiss the juror. At that point, Wittich's counsel asked, "So, your Honor, are we going to seat an alternate?"

¶60 The Commissioner argues that Wittich failed to preserve this issue for appeal because he did not timely object to the juror's dismissal. In response, Wittich quotes a portion of the dialogue quoted above and declares that the "District Court consider[ed] this issue during trial, and in Wittich's Motion for New Trial."

¶61 We have long held that the "general rule is that, by failing to challenge or object, a party waives an irregularity in the impaneling of a jury." *Ledger v. McKenzie*, 107 Mont. 335, 340, 85 P.2d 352, 353 (1938); *accord Keith v. Liberty Cnty. Hosp. & Nursing Home*, 183 Mont. 39, 40-41, 598 P.2d 203, 204 (1979) (concluding that it was "not necessary for us to reach [the party's argument regarding juror disqualification] for in failing to challenge the panel or any juror for cause[,] . . . plaintiff waived any objections she might

28

have had"); *see also Weaver v. State*, 2013 MT 247, ¶¶ 49-50, 371 Mont. 476, 310 P.3d 495 (concluding that "the State effectively acquiesced in the District Court's ruling denying the motion to change venue and failed to preserve the issue for appeal" by not objecting "at trial that an impartial jury could not be selected" or "renew[ing] its motion for change of venue at the conclusion of voir dire").  It follows that a party may waive its right to challenge the dismissal of a juror after the impaneling of the jury by failing to challenge or object to the juror's dismissal.

¶62    Although Wittich's counsel stated that he did not think that the juror had "disqualified herself for cause," he ultimately did not challenge or object to the juror's dismissal.  Counsel did not state an express objection, and his comments were not sufficient to alert the trial court to his disagreement with her removal or to a position that the law required the juror to remain seated.  By failing to object, Wittich acquiesced in the juror's dismissal.  *Cf. Winslow v. Mont. Rail Link, Inc.*, 2005 MT 217, ¶ 42, 328 Mont. 260, 121 P.3d 506 (holding that "we cannot conclude that MRL either consented or acquiesced to the juror's dismissal" by objecting on the record the next morning at the District Court's invitation).  "We will not place the District Court in error 'for an action to which the appealing party acquiesced or actively participated.'"  *Horn v. Bull River Country Store Props.*, 2012 MT 245, ¶ 25, 366 Mont. 491, 288 P.3d 218 (quoting *In re A.A.*, 2005 MT 119, ¶ 26, 327 Mont. 127, 112 P.3d 993).  Accordingly, we conclude that Wittich waived his right to challenge the juror's dismissal, and the juror's dismissal therefore was not ground for granting Wittich's motion for a new trial.

**B. The constitutionality of the statutes underlying the action against Wittich.**

¶63 In its order denying Wittich's motion for a new trial, the District Court reiterated its earlier rulings by stating that "[n]o constitutional issues were or could have been submitted to the jury for their decision." The court continued:

> At the conclusion of the evidence, the Court and parties worked long and hard to arrive at a set of instructions to give to the jury. The Court and the parties agreed that the settlement of instructions would not be recorded but rather, a record of objections would be made outside of the presence of the jury once the Court reconvened in the morning. Each of the parties were provided with the instructions that had been settled the night before. When each of the parties were given an opportunity to lodge any objections to the instructions, as settled, the only objection thereby preserved by Wittich had to do with Instruction No. 28 concerning ignorance of the law.
>
> It is not to be denied that Wittich expressed constitutionality issues and concerns throughout the pendency of this case and during the run up to the trial. It is also not to be denied, however, that there was no preservation of the discrete issue raised in the Motion for New Trial, i.e., the constitutionality of the 2010 statutory definition of contribution that was submitted to the jury as Instruction No. 19.

The court concluded that "the charge to the jury, including as it did the definition of 'contribution' from the applicable 2010 statute, did not violate any of Wittich's constitutional rights."

¶64 The Commissioner argues that Wittich failed to preserve the constitutional issue raised by his affirmative defense. The Commissioner points out that Wittich never sought a ruling or briefed the issue prior to trial and that he did not object to the jury instruction defining "contribution." The Commissioner notes also that Wittich did not object to the District Court's rejection of his proposed jury instruction regarding his affirmative defense.

30

¶65 Wittich counters by arguing that his affirmative defense contesting the statute's constitutionality, and the corresponding definition of "contribution" contained in the jury instructions, "was explicitly preserved, and the District Court confirmed such *during discussions on the Jury Instructions*." (Emphasis in original). Wittich emphasizes that he asserted the affirmative defense prior to trial, that he ensured that the defense was included in the pre-trial order, and that he reiterated his position when the Commissioner moved to strike the affirmative defense during discussion of the jury instructions. Wittich notes that during that discussion, the District Court stated that "everybody's position as it exists now is preserved." Wittich contends that "the parties and District Court were aware that Wittich's ninth affirmative defense contested Montana's definition of contribution in jury instruction 19." In sum, Wittich argues "that the District Court's denial of his motion for new trial was an abuse of discretion because it was an error of law to determine that the issue was not preserved, and that it denied Mr. Wittich a fair trial by permitting jury instruction 19 while prohibiting Mr. Wittich's ninth affirmative defense at trial."

¶66 As Wittich acknowledges, the District Court granted him leave to assert his affirmative defense "[s]ix months before trial." In allowing Wittich to assert the defense, the court noted that "it is a claim that can be handled by briefing prior to the trial, even if the Attorney General needs to be brought into the case." Wittich does not reference on appeal, and the record does not reflect, that he briefed the issue prior to trial.

¶67 Wittich correctly notes that the final pre-trial order contained Wittich's affirmative defense and that the parties discussed the issue during the final pre-trial conference.

During that discussion, the District Court stated that Wittich's affirmative defense was "not a jury question" and that "it might be able to be raised on appeal if the jury were to determine he violated the statute." The court asked Wittich's counsel how the issue would "come up from an evidentiary standpoint." Wittich's counsel suggested that Wittich "could testify that he thinks his First Amendment rights are [being violated]." The court intimated that it would deal with the issue during settlement of jury instructions. Wittich's counsel ended the discussion by stating that the District Court had "raised our consciousness about it so we'll give it more mature reflection to see if we can't come up with additional analysis or an opportunity to withdraw it, but I think we preserve it otherwise."

¶68    At the close of evidence, the Commissioner moved to strike, as a matter of law, Wittich's affirmative defense. The Commissioner's counsel argued that Wittich "failed to present any evidence with respect to any alleged constitutional violations" and that he "failed to preserve those issues through the failure to file any type of pretrial motion with this Court asking the Court to address those issues." Wittich's counsel responded by arguing that Wittich's testimony was "sufficient evidence to show that the laws" under which he was charged violated his constitutional rights. Wittich's counsel argued further that "the fact that the opposing counsel are special attorneys general for the state is sufficient notice of that claim."

¶69    The court reiterated that it had restricted evidence regarding Wittich's constitutional claims at the pretrial conference because the affirmative defense did not

32

"raise the type of claims that are appropriate for submission to the jury." The court

continued:

> The challenges, as I understand them, are to the law. It is alleged that the law violates the First Amendment and the prosecution being undertaken pursuant to a law that the defendant wants to claim is unconstitutional. So it didn't have any place in this trial in terms of what is being submitted to the jury. I'll just defer any ruling beyond that.
>
> Whether there has been waiver, those kinds of things, whether I'll have any other post-trial motions, everybody's position as it exists now is preserved. Waiver hasn't been waived. If it hasn't been waived, you can raise something in this Court. If you needed to challenge the constitution[ality] of the statute, notice anybody up, like the Attorney General in a way other than it was done, I'm not going to decide any of that right now.

The court and the parties then proceeded to discuss the verdict form and a number of the

jury instructions on which the parties had settled off the record the night before.

¶70     During the discussion, the court stated:

> I could go through my understanding of each instruction that was offered and indicate whether they were going to be given, whether they were withdrawn, whether they were modified, or I could just ask, to the extent, consistent with our agreements last night, that if there needs to be objections preserved for the record, I could just allow each of the parties to do so. Otherwise, I am going to indicate that the record will establish that the document that you've been handed with the 31 jury instructions is agreed to. Okay.

The court then asked counsel, "Do you want me to go through one at a time?" Wittich's

counsel responded: "Your honor, we don't wish for the Court to go through one at a time.

We have but one objection that we wish to preserve for the record." Wittich's counsel

proceeded to articulate his objection to an instruction covering ignorance of the law.

Wittich did not object to any other instruction, and he did not object to the court's failure

to give any instruction. The parties discussed a number of minor revisions to other

33

instructions before the court asked if there was "[a]nything [counsel] need[ed] to talk about" prior to the court instructing the jury. Wittich's counsel responded, "No, your Honor."

¶71 A statute's constitutionality undoubtedly is a question of law. *E.g.*, *Williams*, ¶ 23; *Jaksha v. Butte-Silver Bow Cnty.*, 2009 MT 263, ¶ 13, 352 Mont. 46, 214 P.3d 1248. Montana statute provides that "all questions of law, including . . . the construction of statutes and other writings . . . must be decided by the court." Section 26-1-201, MCA. "Montana's constitution clearly constitutes an 'other writing,' the interpretation of which is appropriately within the province of the judge[,] not the jury." *Wadsworth v. State*, 275 Mont. 287, 296, 911 P.2d 1165, 1170 (1995); *accord State v. Poncelet*, 187 Mont. 528, 542, 610 P.2d 698, 706 (1980) (concluding that a witness's testimony regarding the constitutionality of a statute was improper because "the interpretation and application of the United States Constitution was a question of law and not a fact in issue" and therefore the statute's constitutionality "was a determination to be made by the trial judge within his statutory powers"). "Unless and until a party challenges" a statute's constitutionality, "the grounds relied upon by the Legislature for enacting a statute are not assailable by a trier of fact. It is only under the lens of a constitutional challenge that a court is at liberty to look behind the law to determine whether" the law is constitutional. *Jaksha*, ¶ 15.

¶72 "Generally, '[a] constitutional issue is waived' if not presented to the district court." *Kulstad v. Maniaci*, 2010 MT 248, ¶ 20, 358 Mont. 230, 244 P.3d 722 (quoting *In re Custody of Arneson-Nelson*, 2001 MT 242, ¶ 37, 307 Mont. 60, 36 P.3d 874). We have long held that "[i]t is fundamentally unfair to fault the trial court for failing to rule

correctly on an issue it was never given the opportunity to consider." *Paulson v. Flathead Conservation Dist.*, 2004 MT 136, ¶ 37, 321 Mont. 364, 91 P.3d 569 (declining to address a party's equal protection argument on appeal because the party did not raise the issue in the district court).

¶73     Here, Wittich's affirmative defense contesting the constitutionality of the statute underlying the action against him "was a question of law and not a fact in issue.  It was a determination to be made by the trial judge within his statutory powers." *Poncelet*, 187 Mont. at 542, 610 P.2d at 706.  In other words, the statute's constitutionality was "within the province of the judge[,] not the jury." *Wadsworth*, 275 Mont. at 296, 911 P.2d at 1170.  Until Wittich gave the District Court an opportunity to consider his constitutional claim, "the grounds relied upon by the Legislature for enacting [the] statute [were] not assailable by [the] trier of fact." *Jaksha*, ¶ 15.  We conclude that the District Court properly restricted evidence regarding Wittich's constitutional theory during trial and appropriately declined to instruct the jury on that theory.  Additionally, Wittich waived his right to challenge the jury instruction defining "contribution" on appeal by failing to object to the instruction at trial.  *Turk v. Turk*, 2008 MT 45, ¶ 16, 341 Mont. 386, 177 P.3d 1013 ("The failure to object to . . . jury instructions at trial results in a waiver of the right to challenge them on appeal.").

¶74     Finally, the District Court was not "at liberty to look behind the law to determine whether" the law was constitutional "[u]nless and until [Wittich] challenge[d] the constitutionality of [the] statute." *Jaksha*, ¶ 15. Although Wittich asserted the constitutional issue as an affirmative defense, he never asked the District Court to make a

legal ruling on it. Putting it in the final pre-trial order was not sufficient, standing alone, to constitute a request for the court to make a legal ruling prior to taking the case to the jury. It would be "fundamentally unfair to fault the trial court for failing to rule correctly on an issue" that Wittich never gave it an opportunity to actually rule on. *Paulson*, ¶ 37. By not presenting the constitutional issue to the District Court, Wittich waived his right to argue it on appeal. *See Kulstad*, ¶ 20. We decline to address further Wittich's arguments pertaining to the statute's constitutionality. We hold that the District Court determined correctly that Wittich waived his constitutional argument.

¶75 In light of the trial record, we conclude that the District Court did not manifestly abuse its discretion in determining that neither the juror's dismissal nor Wittich's constitutional argument served as grounds for granting his motion for a new trial.

¶76 *4. Whether the District Court acted within its discretion in trebling the verdict amount.*

¶77 The jury determined that Wittich accepted and failed to report $19,599 in corporate contributions, including coordinated in-kind contributions. At the dispositional hearing, the District Court declined to accept the Commissioner's recommendation that Wittich be removed from office, and it considered instead the appropriate financial penalty. The court noted that the "statute says that the maximum penalty that can be imposed is three times the amount of the illegal contribution." The court then imposed a penalty of $58,797 for Wittich's accepting and failing to report the $19,599 in corporate contributions.

¶78     Wittich argues that § 13-37-128, MCA—which governs the amount of liability for violations of campaign laws—is punitive because § 13-37-129, MCA, "illustrates that the amount assessed under § 13-37-128, MCA is a fine" and because the purpose of the statute "is to punish, not to compensate or remedy a damage that was incurred." Wittich asserts that because § 13-37-128, MCA, is punitive, his culpability had to be established by clear and convincing evidence. Wittich contends that the court did not make such a determination. As such, Wittich argues that the District Court's imposition of treble damages was an abuse of discretion.

¶79     Section 13-37-128, MCA, provides that a person who violates certain provisions of Montana's campaign laws "is liable in a civil action brought by the commissioner . . . for an amount up to $500 or three times the amount of the unlawful contributions or expenditures, whichever is greater." Section 13-37-128(1), MCA. Section 13-37-129, MCA, entitled "Liability and disposition of fines," provides that "[i]n determining the amount of liability under 13-37-128, the court may take into account the seriousness of a violation and the degree of culpability of the defendant."

¶80     We are unpersuaded by Wittich's argument that reference to "fine" in the title of § 13-37-129, MCA, makes any liability imposed under § 13-37-128, MCA, punitive so as to require clear and convincing proof. We have held consistently that "the text of the statute takes precedence over the title in matters of statutory interpretation." *Orozco v. Day*, 281 Mont. 341, 348, 934 P.2d 1009, 1013 (1997) (citing *ISC Distrib., Inc. v. Trevor*, 273 Mont. 185, 196, 903 P.2d 170, 177 (1995)).

37

¶81 In determining whether to treble damages for a violation of Montana's campaign laws, "the court *may* take into account the seriousness of a violation and the degree of culpability of the defendant." Section 13-37-129, MCA (emphasis added). Contrary to Wittich's arguments, the statute does not require that a defendant's culpability be established by clear and convincing evidence. The statute's plain language makes clear that a district court's decision to treble damages is discretionary, without a requirement of specific intentional conduct. *See Plath*, ¶ 27 (analyzing a similar provision under the Montana Consumer Protection Act and concluding that the Legislature's intent in drafting the statute "without including specific conduct that would trigger imposition of the treble damage award was to provide for a discretionary award of treble damages which is not punitive in nature and which does not require specific intentional conduct on the part of the defendant"). The District Court's application of the statute was not an error of law.

¶82 Absent legal error, Wittich has not met his burden on appeal to demonstrate that the District Court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice in trebling the verdict amount. Accordingly, we conclude that the District Court did not abuse its discretion.

**CONCLUSION**

¶83 We affirm the District Court's denial of Wittich's motions to dismiss for lack of subject matter jurisdiction, its denial of Wittich's motions in limine to exclude expert testimony, its denial of Wittich's motion for a new trial, and its decision to treble the verdict amount in imposing the penalty. The judgment is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ JIM RICE

Justice Jim Rice, concurring.

¶84   I concur with the Court's resolution of all issues, but offer further observations about Issue 2A.

¶85   I agree with the Court that the Commissioner was permitted, over Wittich's objection, to improperly offer his opinion about ultimate legal conclusions. Further, in what may have been a strategy, the Commissioner was permitted to reformulate issues that would be given to the jury, such as the reporting of campaign contributions and maintaining campaign records, into alternately phrased legal obligations, such as "transparency" and "public trust." For example, the Commissioner testified on direct examination:

> Q.   What role do campaign records kept by a candidate play in regard to Montana candidate elections?
>
> A.   Well, consistent with the requirement of transparency is the requirement that a candidate meet the public trust obligation. The public trust obligation is that a candidate running for office, a candidate serving in office, serves the public and not a private interest. It is the interest of the public that a candidate must serve. Consistent with that, then, when a candidate runs for office, the records of their campaign must be available for inspection. . . . That is consistent with the public trust obligation.

. . .

> It shows a degree of humility on the part of the candidate and acceptance of their responsibility to the public at large, rather than just to themselves.

¶86 Wittich offered another objection at this point in the proceeding, although we have no record of the following discussion. Nonetheless, the Commissioner was permitted to use the witness stand as a soap box for his own vision of campaign finance ("[T]he idea is this: Government functions best in governance if the public believes and understands the influences on government." "[Its] just the culture we have in Montana."). He was permitted to weave legal-sounding concepts into his testimony, such as "public trust," as quoted above, and the requirement of "transparency" in campaigns ("So the word that is used is transparency. So the campaign finance reports, when filed, are intended to inform voters. . . . so it's supposed to be complete transparency.") and then testify that Wittich had violated these concepts ("[M]y opinion is that, as a matter of fact, this record production fails the public trust obligation that is inherent in every candidate for office in the State of Montana."). Violation of the law was thus conveyed to the jury through the Commissioner's testimony.

¶87 Even further, the Commissioner was permitted to use inappropriate, political labels that could have the effect of painting Wittich as sinister ("That is dark money. It is dark in every way you can get it.").

¶88 These statements should not have been admitted, and if they constituted a significant part of the Commissioner's testimony, I would vote to reverse Wittich's conviction. However, the Commissioner's lengthy testimony was dominated by hard

factual evidence of campaign law violations. For example, the Commissioner testified on direct:

> Q. [C]an you identify paid personal services that were provided in the 2010 Senate District 35 primary election that are not listed on Mr. Wittich's campaign finance reports for that election?
>
> A. I can do that. Those paid personal services include general campaign management provided Art Wittich by National Right to Work staffers Christian LeFer and Sarah Arnold, specific campaign management provided by Sarah Arnold in the form of processing and distributing the candidate profile, candidate biography and candidate photos in a manner that allowed use by the National Right to Work staff in Virginia and in Montana, the graphics, website, and programming by National Right to Work staffer Andrew O'Neill, the campaign opponent research by National Right to Work staffer Sarah Arnold, the writing and copying . . . that were sent out to voters, the writing and copy for seven candidate letters, including the wife letter, by National Right to Work staffer Jedd Coburn, the editing of that letter by National Right to Work staffers Christian LeFer and Sarah Arnold, the development of the voter ID list for the entirety of Senate District 35 and delivery of that list to Art Wittich as a walking list.

¶89    While the Commissioner was not properly reined in while on the stand, he did get to the meat of the matter, and offer proper factual information that Wittich had violated the law, as well as proper expert testimony informing the jury about the finance process. In the context here, including overlapping concepts of fact and law, I believe the Commissioner's statements about the law did not prejudice the outcome or otherwise undermine the propriety of the proceeding.

¶90    I concur.

/S/ JIM RICE

41