FILED

09/26/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0323

DA 21-0323

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 181

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

RANDY VAUGHN SNEED,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                   In and For the County of Gallatin, Cause No. DC-19-52C
                   Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Carolyn M. Gibadlo, Assistant Appellate
          Defender, Missoula, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Bree Gee, Assistant Attorney
          General, Helena, Montana

          Audrey S. Cromwell, Gallatin County Attorney, Bradley D. Bowen, Deputy
          County Attorney, Bozeman, Montana

                          Submitted on Briefs:  June 14, 2023

                                  Decided:  September 26, 2023

Filed:

_____
              Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1      Randy Sneed (Sneed) appeals from the May 7, 2021 Sentencing Order issued by the Eighteenth Judicial District Court of Montana.  The District Court sentenced Sneed based on three counts: strangulation of a partner or family member, a felony, in violation of § 45-5-215(1),(a), MCA; partner or family member assault, a misdemeanor, in violation of § 45-5-206(1),(a), MCA; and endangering the welfare of a child, a misdemeanor, in violation of § 45-5-622(1), MCA.

¶2      We restate the issues on appeal as follows:

> *1.  Did the District Court abuse its discretion when it permitted Dr. Kuehl to testify about the legal and medical definitions of strangulation?*
>
> *2.  Did the District Court abuse its discretion when it allowed Officer Clark to testify that Sneed was charged with a felony and detained in the "high-risk, violent crimes pod?"*
>
> *3.  Did the District Court abuse its discretion when it allowed the State to play Sneed's statements in Exhibit 22?*
>
> *4.  Did the District Court's evidentiary rulings create cumulative error?*
>
> *5.  Did the District Court abuse its discretion when it refused to address Sneed's concerns regarding Juror R.?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3      On January 11, 2019, Sneed got into a fight with his partner, Kateland Stephens (Stephens).  Sneed was lying on the bed with their sleeping, ten-month old daughter, IS.  Stephens tried to leave with IS, but Sneed refused to let them.  As Stephens attempted to exit the bedroom while holding IS, Sneed blocked her by grabbing onto her throat and pushing her to the bed.

¶4      Stephens left after that, leaving IS with Sneed, and called the police. Stephens reported to police that Sneed poked her in the eye and grabbed her by the throat, pinning her down and putting all his weight on her.

¶5      Officer Clark responded to Stephens's call. He met with Stephens at a gas station and examined her injuries. He took pictures of what appeared to be redness on Stephens's neck and puffiness in her left eye. Afterwards, Officer Clark went to Sneed's house to investigate further. Sneed admitted he grabbed Stephens by the throat. However, Sneed claims he guided Stephens by the throat down to the bed so that he could take IS away from her. Consequently, Officer Clark arrested Sneed for felony strangulation of a partner or family member.

¶6      The District Court held a jury trial during which the State presented multiple pieces of evidence now at issue on appeal. The evidence includes expert witness testimony, Officer Clark's testimony, and a recording from an Order of Protection Hearing. Additionally, one Juror, Juror R., was checking his phone and dozing off during the trial. The District Court refused to admonish the jury member at Sneed's request. The jury convicted Sneed of count one: strangulation of a partner; count two: assault of a partner; and count three: child endangerment. The District Court sentenced Sneed to a five-year DOC commitment with three years suspended for count one; 12 months with 11 months, 21 days suspended for count two; and 6 months, all suspended for count three. Sneed appeals.

¶7      We affirm.

## STANDARD OF REVIEW

¶8 Trial courts have broad discretion to determine the relevance and admissibility of evidence. *State v. Passmore*, 2010 MT 34, ¶ 51, 355 Mont. 187, 207, 225 P.3d 1229, 1245. Thus, this Court generally reviews evidentiary rulings for an abuse of discretion. *Passmore*, ¶ 51. "A court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *Passmore*, ¶ 51.

¶9 "The trial court is in the best position to observe the jurors and to decide the potential for prejudice when allegations of juror misconduct are raised; therefore, the trial court has significant latitude when ruling on these matters, and its determination is given considerable weight by this Court. This Court will defer to that determination absent a showing of prejudice." *State v. Rennaker*, 2007 MT 10, ¶ 29, 335 Mont. 274, 150 P.3d 960 (internal citations omitted).

## DISCUSSION

¶10 *1. Did the District Court abuse its discretion when it permitted Dr. Kuehl to testify about the legal and medical definitions of strangulation?*

¶11 During trial, Dr. Tiffany Kuehl (Dr. Kuehl) testified as an expert witness, on behalf of the State. Dr. Kuehl explained the difference between choking and strangulation:

> **[State]** So in the context of being a medical professional, could you define the term "choking"?
>
> **[Dr. Kuehl]** Choking is obstruction of the airway, usually by some object that's inside the airway. Like I choked on some food, that type of thing.
>
> **[State]** In the context of being a medical professional, could you define "strangulation"?

**[Dr. Kuehl]** Strangulation is an injury that occurs through mechanical, external compression of the neck to the point of an alteration in level of consciousness through impairment of breathing or circulation.

**[State]** It's complicated. What does that mean?

**[Dr. Kuehl]** It means that it's an injury that is occurring usually through application of force to the outside of the neck to obstruct or block the blood flow to the brain or block the flow of air into the lungs.

**[State]** If strangulation is defined as purposely or knowingly impeding the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck of the person, how does that compare with your understanding of that term from a medical perspective?

**[Dr. Kuehl]** It's nearly identical. I think it's consistent.

Although Sneed now takes issue with Dr. Kuehl's answer that the definitions are "nearly identical," he did not immediately object to this line of questioning.

¶12    However, later in the examination, Sneed objected when the State asked:

**[State]** If strangulation is defined as purposely or knowingly impeding the normal breathing or circulation of the blood of a person by applying pressure on the throat or neck of the person, how hard does a person have to apply pressure to the throat or neck of another person to impede their normal breathing and circulation?

**[Dr. Kuehl]** Four pounds of pressure.

**[State]** Twelve or four?

**[Dr. Kuehl]** Four pounds.

**[State]** And that would be for the initial carotid artery; is that correct?

**[Dr. Kuehl]** That would be to occlude the jugular vein.

**[State]** If a person is asked how did you stop her and the response is "I grabbed her by the throat," how is that statement "I grabbed her by the throat" consistent with strangulation as we defined it?

5

**[Defense]** Objection, Your Honor. Facts not on the record.

**[District Court]** Overruled.

**[Defense]** Also calls for speculation, Your Honor.

**[District Court]** Also overruled.

**[Dr. Kuehl]** So grabbing the neck implies that a physical force of compression has been applied to the neck. In terms of whether that would impede the blood flow, it would meet the definition of strangulation if the victim had symptoms of impairment of consciousness in any way.

¶13 Sneed argues Dr. Kuehl made an improper legal conclusion that the facts of this case meet the criteria for strangulation. The State argues Dr. Kuehl's testimony was appropriate as she did not testify about whether Sneed had the requisite mental state to commit the crime, and her testimony was based on hypothetical questions.

¶14 We review a district court's admission of expert testimony to determine if there was an abuse of discretion. *Sharbono v. Cole*, 2015 MT 257, ¶ 10, 381 Mont. 13, 15, 355 P.3d 782, 785. Further, even if testimony on an ultimate issue of fact may implicate legal issues, expert testimony is admissible if it does not reach a legal conclusion or apply the law to the facts. *Comm'r of Political Practices for Mont. v. Wittich*, 2017 MT 210, ¶ 41, 388 Mont. 347, 360, 400 P.3d 735, 745. It is the jury's job, not the witness's, to apply the law to the facts of the case. *Wittich*, ¶ 41.

¶15 Here, the State posed hypothetical questions to Dr. Kuehl to clarify her medical definition of strangulation versus choking, and by asking her "[i]f a person is asked how did you stop her and the response is 'I grabbed her by the throat,' how is that statement 'I grabbed her by the throat' consistent with strangulation as we defined it?" Dr. Kuehl

6

responded by describing the signs and symptoms of strangulation based on the hypothetical scenario the State gave. She did not apply the law to the facts of this case. Furthermore, Dr. Kuehl never reached a conclusion that Sneed committed the crime. Nor did she attest to whether Sneed had the requisite mental state to commit the crime. The jury was still tasked with determining whether Stephens experienced symptoms of strangulation and whether Sneed acted purposely or knowingly. Accordingly, the District Court did not abuse its discretion regarding Dr. Kuehl's testimony.

¶16 *2. Did the District Court abuse its discretion when it allowed Officer Clark to testify that Sneed was charged with a felony and detained in the "high-risk, violent crimes pod?"*

¶17 During trial, the State called Officer Clark to testify. The State questioned Officer Clark about Intelmate—the system that monitors all inmate phone calls. The State asked Officer Clark about factors he used to verify calls, including inmate ID numbers, phone numbers that were called, and the phone from which the inmate called. Specifically, the State asked:

> **[State]** Okay. And you were able to review the records and they tell you which phone number was called, correct?
>
> **[Officer Clark]** Yes.
>
> **[State]** And they tell you which phone in the detention center makes the call, correct?
>
> **[Officer Clark]** Yes, from which pod.
>
> **[State]** And it would be E Pod in this case. What's E Pod?
>
> **[Officer Clark]** That's a high-risk, violent crimes pod.
>
> **[Defense]** Objection. Move to strike, Your Honor.

7

¶18　The District Court overruled Sneed's objection and motion to strike. Sneed did not offer a reason for the objection, nor did the District Court offer a rationale for its overruling. Sneed now argues the District Court abused its discretion when it admitted Officer Clark's statement related to the "high-risk, violent crimes pod" because it was irrelevant and unfairly prejudicial because it diluted his presumption of innocence and encouraged the jury to prejudge him. Relevant evidence is evidence having any tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. Mont. R. Evid. 401. Based on the context of the questioning, it is clear the State was asking foundational questions to establish a basis for Officer Clark's knowledge of Sneed's phone call with his mother.

¶19　The State asked Officer Clark what E Pod was and he answered. In doing so, Officer Clark made no assertions as to Sneed's guilt. In addition to asking Officer Clark what E Pod was, the State also asked him whether he could tell which phone was called from, what number was called, and which inmate made the call. Answers to these questions establish the foundation for the phone call the District Court subsequently admitted into evidence. Officer Clark's response to these questions show how well-informed Officer Clark is with the technology that logs inmate calls and with the phone call in question. While we agree the specific population make-up of pod E was not necessary or relevant to establish Officer Clark's familiarity and knowledge of the jail phone-log system and was prejudicial, on the record before us we cannot find its admission was reversible error.

¶20 This Court has a two-step analysis to determine whether an error is harmless. *State v. Buckles*, 2018 MT 150, ¶ 17, 391 Mont. 511, 517, 420 P.3d 511, 516-17. First, the Court must determine whether the error was structural error or trial error. *Buckles*, ¶ 18. Structural error impacts the framework of the entire trial, whereas trial error occurs during the presentation of the case to the jury. *Buckles*, ¶ 18. Here, the admission of Officer Clark's testimony was trial error. Thus, reversal for structural error is not supported.

¶21 The second step of the harmless error analysis is to determine if the error was harmless. *Buckles*, ¶ 18. "If the tainted evidence was admitted to prove an element of the offense, then the State must direct us to admissible evidence that proves the same facts as the tainted evidence and demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction." *Buckles*, ¶ 18. The testimony as to the E pod population was very brief, the context within which it was made—establishing foundation for Officer Clark's knowledge of the jail phone-log system—did not emphasize its prejudicial nature, and no further emphasis or elaboration of it was made during trial or upon closing. Further, given the significant amount of other evidence supporting Sneed's guilt, including his own admission that he grabbed Stephens's throat, we cannot conclude Officer Clark's brief statement as to the make-up of E Pod contributed to Sneed's conviction. As such, any error in its admission was harmless.

¶22 *3. Did the District Court abuse its discretion when it allowed the State to play Sneed's statements contained in Exhibit 22?*

¶23 During trial, the State offered Exhibit 22 into evidence. Exhibit 22 is a recording, in a separate legal cause, of an Order of Protection (OOP) hearing concerning Stephens's

9

request for a restraining order against Sneed. The State played various portions of the hearing while examining Stephens. In the recording, Sneed talked about his relationship struggles with Stephens. Sneed said he found messages between Stephens and her ex-boyfriend where she admitted she did not love Sneed anymore. Sneed talked about how angry he became and that he told Stephens to move out of their house that day. He also mentioned how he had not seen their daughter, IS, in over 20 days. He did not know where they were living or how IS was getting diapers.

¶24 Sneed argues the statements in Exhibit 22 were irrelevant, and even if they were relevant, they suggest to the jury that he is guilty of the crime charged. The State argues Sneed's testimony at the OOP hearing was relevant to show he was angry with Stephens and unable to handle her leaving with IS the day he allegedly strangled Stephens. The State claims the statements from Exhibit 22 are admissible as an admission of a party-opponent and to show Sneed's motive and state of mind.

¶25 We agree with the State. An admission by a party-opponent is not hearsay and may be offered against him. Mont. R. Evid. 801(d)(2). Here, Sneed is the party-opponent. He made the statements under oath in the OOP hearing. The State offered those statements against Sneed in the trial below. Exhibit 22 is relevant because it tends to show Sneed more probably than not had motive to strangle Stephens. In Exhibit 22, Sneed talks about how angry he was when Stephens left and how desperate he was to get her to come back. Add to that the messages Sneed found between Stephens and her ex-boyfriend, and a possible motive becomes clear. Thus, the statements made by Sneed contained in Exhibit

10

which the State presented are admissible and the District Court did not abuse its discretion in this regard.

¶26    *4. Did the District Court's evidentiary rulings create cumulative error?*

¶27    Sneed argues that if the above three issues do not demonstrate reversible errors on their own, then together they prejudiced Sneed's right to a fair trial. The cumulative error doctrine states that when prejudice results from the cumulative effect of two or more individually harmless errors that, when combined, have the same prejudicial effect as a single reversible error, the sum is basis for reversal. *State v. Cunningham*, 2018 MT 56, ¶ 32, 390 Mont. 408, 421, 414 P.3d 289, 298. To warrant reversal, the defendant must establish prejudice because merely alleging error is not sufficient. *Cunningham*, ¶ 32.

¶28    Here, we conclude only one harmless error—admission of Officer Clark's testimony as to the population make of E Pod. As such, Sneed has failed to demonstrate cumulative error.

¶29    *5. Did the District Court abuse its discretion when it refused to address Sneed's concerns regarding Juror R.?*

¶30    The State argues that Sneed did not object when the judge refused to admonish Juror R. for being on his phone, and therefore, we should not consider it on appeal. On the contrary, Sneed argues that his oral request was akin to a motion, therefore, he preserved the issue for appeal. We conclude that an oral request to the district court to admonish the jury is sufficient to raise the issue at the trial level and preserve it for appeal. The District Court, in essence, overruled the request by stating it would not admonish the jurors. Accordingly, we address the issue on appeal.

11

¶31    During trial, Sneed asked the court to admonish the jury for using their phones in the courtroom.  After a recess, and prior to the jury returning to the courtroom, the defense stated:

> **[Defense]** Your Honor, it sounds like at least one of the jurors has been checking his phone. I believe that they were admonished beforehand, but I just wondered if the Court would either re-admonish or perhaps colle[c]t their cell phones.
>
> **[District Court]** So what the rule is, Mr. Rutzke, is that they can't use their phone to communicate about the trial. We don't take their phones away from them during the trial. When they're deliberating, though, we take the phones away from them . . . . Once they deliberate, we take their phones away from them. So one of jurors is just out, probably the guy on the corner, the contractor guy?
>
> **[Defense]** Yeah.
>
> **[District Court]** Probably checking his phone, I bet.
>
> **[Defense]** Yeah.
>
> **[District Court]** Yeah. So, Mr. Rutzke, you know what, I'm not going to admonish him about that because I don't care if he's looking at it a little bit because he's—frankly, I would rather have him looking at his phone than dozing off because he's been sleeping some because I've been watching, but I'm not going to say anything to him, but I will tell you, Mr. Rutzke, though, they can't talk about the trial and when they're deliberating they won't have their phones, okay?
>
> **[Defense]** Thank you, Your Honor.

¶32    Both the state and federal constitutions protect an individual's right to a fair and impartial jury.  Mont. Const. art. II, § 24; U.S. Const. Amend. VI.  Sneed now asserts Juror R. was on his phone and falling asleep during the trial.  For that reason, Sneed claims he was prejudiced and is entitled to a new trial.

¶33    We have previously noted, "[t]he trial court is in the best position to observe the jurors and to decide the potential for prejudice when allegations of juror misconduct are

12

raised; therefore, the trial court has significant latitude when ruling on these matters, and its determination is given considerable weight by this Court. This Court will defer to that determination absent a showing of prejudice." *Rennaker*, ¶ 10.

¶34 Although Sneed requested the court re-admonish the jurors to refrain from using their phones, Sneed has not demonstrated how he was prejudiced or deprived of a fair and impartial trial in this regard. Sneed's counsel, in making his request for re-admonishment, did not note the depth or breadth of any problem, did not identify any particular juror or conduct by a juror or jurors that was so prejudicial it warranted a new trial, did not ask for a new trial, did not make further offer of proof but merely thanked the court when it advised it had been monitoring jurors and was not going to re-admonish jurors or collect their cell phones. While it appears from the record that Juror R. may have checked his phone or dozed off, it also is apparent from the record that the District Court was attentively monitoring Juror R.'s behaviors along with those of the rest of the jury. The record provides no indication of a juror issue other than the conversation noted above. We decline to speculate as to how frequently Juror R. was on his phone, whether he actually fell asleep, or whether he experienced any distraction of significance. Thus, on the record before us and our determination that the trial court is in the best position to observe the jurors and to decide the potential for prejudice when allegations of juror misconduct are raised, we cannot determine Sneed's right to a fair trial was prejudiced by juror misconduct and we find no error in this regard.

13

## CONCLUSION

¶35 Other than a harmless error involving a brief statement of the make-up of the population of E Pod at the jail, Sneed has failed to establish the other errors he asserts—that the District Court erred in permitting the testimony to which Sneed objected of Dr. Kuehl, in admitting Sneed's statements made in a separate legal proceeding, or in assuring no prejudicial juror misconduct occurred. Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ JIM RICE